Good morning. You saved the best for last. My name is Elizabeth Schneider. I'm representing the Chapter 13 trustee, Rod Danielson, and I'd like to reserve three minutes, if I may, for rebuttal. Justice Pregerson, you more than anyone understands the rationale, the exclusively linked rationale, that was used in support of the Kagan-Vama holding for both holdings, and that would be the holding on projected disposable income as well as applicable commitment period. You more than anyone understand the importance of that rationale and the effect that Lanning, Hamilton v. Lanning, had when it overruled on the first issue of projected disposable income and what little, if left, of that rationale to support the remaining holding on applicable commitment period. Thank you for the compliment. Well, there's a reason for that compliment, but a lot has happened since Kagan-Vama. First of all, Kagan-Vama came to this Court on direct appeal. It came three years into BAF-CEPA, which was passed in 2005. BAF-CEPA, unfortunately, was anything but the model of clarity, and the issues that we saw when BAF-CEPA was first passed are still being litigated today, this being one of them. The fact that since Kagan-Vama, we've now had four more years of the time and opportunity to articulate arguments. We have also had the benefit of two, now two, Supreme Court rulings, Hamilton v. Lanning as well as Ransom. Since Lanning, we now have two circuit court cases, Tennyson v. Baud, that now hold the opposite of Kagan-Vama on the issue of above median income debtor with negative or zero projected disposable income. Now, as we've argued in our opening brief, we believe that the effect of Lanning not only undermined the rationale to the point where both the bankruptcy court and this court are no longer bound by the prior ruling, but with the holding in Lanning, and I want to go back to Miller v. Gamey, which basically says that when a court of higher authority adopts a rationale that undermines the ruling in the prior decision, then the lower court is bound by the rationale of the higher intervening court. That's exactly what the bankruptcy court said. That's exactly what the bankruptcy court did and no longer felt bound by Kagan-Vama and ruled as the bankruptcy court ruled. But given that precedent, counsel, we have to find that the two, the more recent authorities, clearly irreconcilable, right? Correct. It's pretty high standard. Pretty high standard. And how do we find that when in the Lanning case or Hamilton case, the focus was on one provision. I understand it's all in the same section, B1 or B, but it was focusing on really the meaning of projected. That was a textual analysis of what projected with respect to disposable income is. Yes. So 80% of the opinion is really about a textual-based analysis without any regard to applicable commitment period. Why is that so clearly irreconcilable? I mean, if we disagreed respectfully with how Kagan-Vama may have been decided in the first place and would be sympathetic to Tennyson and Bau's analysis, it's there. It's precedent. Well, what makes Kagan-Vama unusual is the fact that it was exactly the same rationale that was used for both holdings. When you go into Kagan-Vama, it was this exclusively linked rationale. In other words, when BAF-CIPA introduced the subsections 2, 3, and 4, because those subsections weren't there prior to BAF-CIPA, that the sole and exclusive purpose of subsection 2 and subsection 3, disposable income, was to define projected disposable income. The Supreme Court did not adopt that rationale. That exact same rationale was used as to applicable commitment period. Well, except you argue that there was this clean decoupling of B2 and B3 from B1. And I don't read it that way. The Court said in most cases B2 and B3 will be used to define projected. In most cases they will, yes. But it just allowed some flex because of the key word projected. So there wasn't a decoupling. Perhaps there was some distance, but it was still using provisions that followed B2 and B3 to inform how the calculus works under B1. They're still linked, but they're no longer exclusively linked. In other words, B2 and B3 no longer serve the sole and exclusive function of defining B1. And we're taking that rationale and applying it to applicable commitment period. In other words, the sole and exclusive purpose of applicable commitment period is no longer to just define applicable commitment period in B1, but now just as you can go to projected disposable income under the right circumstances, you go to applicable commitment period. The fact that we have two, we have this court, the Kagan-Vema court, and you have two other circuits, Tennyson and Baud, now in disagreement with each other, tells us that plain reading of the statute, we're getting two different readings of the statute. Therefore, we can go down to the next level. Whatever we do, we're not going to create a circuit split because there is one. Pardon me? Whatever we do, we'll not create a new circuit split because there already is one. There already is one, yes, yes. And now depending on how this court rules, there may or may not be a circuit split in the future. But it depends on what this court believes in terms of our arguments and the correct course to take. Now, because we have a circuit split, our position is that the rationale in support of the applicable commitment portion of the Kagan-Vema holding is no longer sufficient that that rationale is controlling. Then I guess the next question is, is did the bankruptcy court make a decision, a correct decision in her analysis of the statute? Now, you start with plain meaning. Then if it's not plain on its face, then you can go down to congressional intent. And I would like to direct the court, if I could, again to page 44 of the chapter 13 trustees opening brief, because this particular section of the congressional record, I think, is very, very informative as to congressional intent when it introduced the concept of applicable commitment period in subsection D4. And if you read it, it's talking about a minimum plan duration requirement. You know, this whole idea of congressional intent is just a fiction that we've created. Well, I hear what you're saying. However, the Supreme Court's cases are rather clear that if you have plain meaning, if you don't have plain meaning, then you can go down to congressional intent and look to the congressional record as to what was meant when particular provisions were introduced and brought into law. I know what you're saying. I asked one of my dear friends who was a leader in Congress, well, you voted for this bill. Yeah. What was your congressional intent at that time? He said, what the hell are you talking about? I said, congressional intent, that's important. We need to know that. Who told you that? Well, it's the way they talk. My intent, he said, was to get the best bill that the leadership thought we could get at that time. That was his intent. I understand what you're saying, politics versus what we're really trying to do here. I mean, one of the purposes of the bankruptcy laws, and they have their roots in the Constitution, is to give the debtor a second chance. And what we were talking about in the Kagan-Lima case was that, yes, one can compute what the disposable income is, what's needed for this person to be able to live and pay their bills, and if there's an excess, that amount of money can go to the creditors, right? Well, what the means test did Let me just finish and go to the creditors. And we have this five-year period. And then in this Kagan case, the overall sum that this person would be able to contribute towards the creditors over a five-year period was then apportioned over a three-year period. So the person would get a discharge in bankruptcy and then be able to go on with their lives and do what they were doing. And so the creditors, instead of waiting five years out, would get it in three years. And, of course, there's this thought that, well, maybe this person might win the lottery and could come up with more money at the end of the five-year period. I've run out of time. It's all right. We'll give you time. Okay. Then I don't really, it's not clear to me that there's any conflict between what the Supreme Court did and what the judge, I think it was Seiler, did in the case where I joined him. The whole exclusively linked rationale is premised or founded on how the three-year period acted pre-BFSEPA, before the new legislation came in. It acted exclusively as a multiplier. Now, there was some case law that said at the time of confirmation, it was a mandatory term requirement. This is something that BOD was pointing out in its reasoning. But at plan modification, this is Burchard versus Sahara that said, nope, there is no minimum plan term retirement. You can pay off your plan and complete in a time sooner than 36 months. Then BFSEPA came along. And BFSEPA introduced this concept of applicable commitment period. And the whole, the exclusively linked rationale is premised and based on how it functioned pre-BFSEPA. What we're arguing is that when Congress created this applicable commitment period and then defined it, the threshold under B-4 is whether you're above or below median income. And that there is no place in the statute that says it does not apply if you're above median income with zero or negative disposable income. The way you get to that conclusion is to say that B-4 is exclusively linked to B-1 and in a case, and this is exactly what Kagan-Vema did in its rationale and said, well, if you have no projected disposable income or zero, then there is no applicable commitment period. And as a result of that holding, and if you look into the record, there's a declaration by me because I have done many, many 341A meeting accreditors, and sure enough, right after Kagan-Vema, we were starting to get six-month plans in cases where we had a debtor who was above median income with negative disposable income. Can you explain again the three-year, how the three-year provision worked under the pre-BFSEPA? BFSEPA. How did it work? Having done, I cannot tell you how many 341A accreditors. Sounds like a skin disease. BFSEPA. Well, that's how the judges pronounce it in the bankruptcy court, so that's how I'm going to pronounce it. Pre-BFSEPA, we had the provision that said that only upon the objection of the Chapter 13 trustee or an unsecure creditor, you either had to pay 100% to your unsecure creditors or project a disposable income multiplied by the three-year period. Then BFSEPA, and how that worked out in the field when we were computing that particular requirement of the code is we would take I and J, we would verify the income, you'd look at J, and under the code it was reasonable and necessary expenses. You had a bottom-line number. The bottom-line number on I and J is not the same as the means test, and I can explain why, but I'm not going to take that time right now, valuable time, but you would take that number and you would multiply it by 36. That gave you the total that needed to come into the plan. You subtracted out attorney's fees that were going to be paid into the plan, secured and priority creditors. You'd factor in the administrative claims, which is pretty much the fees that are going to attach on distribution for Chapter 13 trustee fees to fund the Chapter 13 trustee operation, and then what was left you used to determine what the percent to the unsecured creditors would be. It was only a test as to the percent to the unsecured creditors. Then BFSEPA... What did the Chapter 13 trustee earn? Oh, boy. I know that it's under the auspices of the United States trustee program. His earnings are not based on the Chapter 13 trustee fees. The fees are adjusted annually by the United States trustee, only the amount that's necessary to run the operation. The Chapter 13 trustee's salary is in no way tied to the trustee fees. We only have the percentage based on how much is necessary to run the office. To get back to the pre-BFSEPA, so it sounded like the three-year that was stipulated that was then substituted with the language that we're talking about here was a multiplier to determine the overall... We had some case law that said that there was a temporal requirement. Some case law. Yeah, and it's not argued in any one of my briefs, and the only reason why I brought that up is because I noticed that in the BOD analysis when I was going over that case yesterday, but it was used as a multiplier. Then you get BFSEPA, and it introduced not only the means test and the calculation of this new projected disposable income, particularly if you were above median, but it also introduced this new concept of applicable commitment period and the threshold trigger being whether you were above or below median. That did not exist pre-BFSEPA, and the law, Burchard v. Sunohara, certainly goes along with that, that there was no minimum plan length requirement, only a maximum under 1322. But why wouldn't the decision in Lanning, in Hamilton, which says one of the things they look to besides the textual analysis is the pre-BFSEPA bankruptcy practice because, quote, we will not read the bankruptcy code to erode past practice absent clear indication that Congress intended a departure. So the starting point, the default, is that practice continues. So isn't it... It seems consistent from what you just described that sort of using this as the multiplier to determine the liability of the plan or what has to be paid in the plan, it is linked. I mean, it seems not inconsistent with Kagan v. Vienna. Well, it all depends on how you look at congressional intent. Because we think the insertion of the applicable commitment period is a clear indication that Congress intended to change that. Now, I understand what you're saying logically, but I also think that if it did not apply as to projected disposable income, then exclusively linked does not apply as to applicable commitment period, and now they coexist. And I've run out of time, so thank you very much. And I'll turn it over. Good morning, Your Honors. Nancy Clark representing the debtors Cesar and Ana Flores. May it please the Court. The debtors in this case filed Chapter 13 bankruptcy in order to save their property. They presented a three-year plan in good faith and based on this Court's ruling in Kagan v. Vienna. They could have filed a Chapter 7 bankruptcy. They were eligible because they had a negative disposable income. However, they wanted to save their home and part of the American dream, and so they went forward in the Chapter 13 instead of the Chapter 7 and made some sacrifice to their budget in order to provide for their creditors and in order to save their home. Now, their reliance on this Court's ruling in Kagan v. Vienna is supported by stare decisis. Well, counsel, regardless of their reliance, if the Supreme Court undercuts our earlier case, it does, regardless of... I mean, I know your argument is that it doesn't, but let's assume a situation in which they relied on Ninth Circuit precedent. Six months later, the Supreme Court flatly overrules it and says, it's wrong. Of course, they've never actually done that, but we'll just assume that as a hypothetical. Then what does their reliance have to do with it? Well, their reliance, Your Honor, is part of the reasons for stare decisis as cited... Is it legally relevant to our analysis of whether the Supreme Court overruled it or not? No, Your Honor, it isn't legally relevant, but it does go along with the argument regarding stare decisis that we have precise law that we can count on in the future in order for all people to be able to interpret the law as they move along. I had a very specific question that you might be able to help me with. I could not understand how the Bankruptcy Court arrived at the amount of the monthly payment in the five-year, 60-month plan that it ultimately confirmed. Is that something that you're challenging in any way? The amount, the $148. I believe that we had an interlineation between the trustee and the debtors. The debtors had agreed to increase the $148. However, we had not agreed to go five years. We had only agreed to a three-year plan. Okay, so you're not challenging the $148 part of it? We're not challenging the $148 part of it. We're challenging the length of the plan under applicable commitment period. And therefore, the total amount, because it would go for however many years. That is correct, Your Honor. Okay, thank you. I was a little at sea on the... So the same amount, the monthly applies just for a longer period, or does that change? I'm a little confused myself. No, no. The order on confirmation is $148 for 60 months. What the debtor is objecting to is the 60 months. So if it were shortened to 30... We want 36 months. We proposed a plan that said $122 for 36 months. At the 341A hearing, there was discussion with the trustee regarding issues about available funds. And through an allineation, we... So the $122 to $148 was something that you agreed to offline, as it were. That's why I couldn't figure out on the record where it came from. It is not part of the court's decision. Okay, thank you. That's very helpful to me. Yes, it's not part of the court's decision. Okay. And as I was trying to state before, Lanning did not overrule the ruling in CAG and VIAMA as it applies to applicable commitment period. It merely discussed the ruling as to projected disposable income. And in doing so, it did not decouple, as the trustee would say, the provisions of 1325. In fact, it stated that only in extreme circumstances would you veer from the ruling on CAG and VIAMA on projected disposable income, which would be the 1325B2 analysis of how you would calculate disposable income. And therefore, it is not binding, and it doesn't even... The court specifically stated that it was not ruling on applicable commitment period. So therefore, it has no precedence over this court in order to have this court then overrule its prior decisions. It is not like in GAMI. There is no decision in between the two decisions that has basically made this irreconcilable. What about, counsel, what about the Lanning's court not only looking at the textual analysis and the pre-BAF-CEPA practice, but also looked at what it said would be avoiding senseless, nonsensical results in going through that. Doesn't that sort of vindicate Judge Vea's dissent? Not necessarily, Your Honor, because this debtor was... Any debtor, actually, with negative disposable income is eligible for Chapter 7. So if they're eligible for a Chapter 7 where in a three- to four-month period they could dispose of all of their dischargeable under Chapter 7 debt, then why would it be senseless for them to then have a three-year plan instead of a five-year plan? But that... I'm not sure how, again, that relates once they've made the decision that they're not going to go under Chapter 7, which has its own set of rules and definitions. Instead, they're under Chapter 13. So the fact that they thought about something else or something else might have been available, I'm not really sure, again, how that relates to the interpretation of these statutory provisions. Well, Your Honor, I don't think that there's a sense... The question was, is there a senseless result in... Right, within Chapter 13 itself, within these... It isn't whether... I don't think that the Supreme Court was talking about whether results are peculiar in any one given case. I think they're talking about the operation of the statute, if one interpretation would make it operate in a way that doesn't generally make sense. I don't think they're talking about any individual. So how would this work in your view? Well, Your Honor, in Judge Baird's dissent, I believe what he terms to be something that's senseless is a presumption that over the additional two-year period that debtors would have increased income and that creditors could capture that increased income. That's just a presumption. I don't think it's actually... Well, it might not, but if the period is only three years and in year number four the debtor's situation improves greatly, there's no opportunity to capture that. So I think he's talking about opportunity. If it goes for five years and something good happens for the debtor in year four, there's an opportunity to come in and revise it. It doesn't mean that it's going to happen in every case, but just structurally was Congress trying to lengthen this period as a minimum amount during which creditors would have that opportunity? I don't believe so, Your Honor. I believe that you have to go back and look at the projected disposable income, and I think you have to go back to see what the previous case law was. The basis was that you would go up to three years, and then for cause you would go further. The previous case law required that creditors be paid more quickly, and then for cause only would a debtor be able to go a longer period of time. So I don't think it's completely inconsistent with the prior precedence, prior case law, that Congress would have intended that negative disposable income debtors would end up in a three-year plan or less. Or less. It could be a one-day plan. As the judge jury pointed out, there are other provisions in 1325 that address good faith issues that can be brought up by creditors and the trustee in objection to anything that is less than the three-year plan. However, that doesn't negate the fact that a negative amount is the result of the means test, and therefore there is no applicable commitment period under this prior ruling in Kagem-Gyama. Is it accurate that there is no opportunity to modify under 1329 once the plan terminates? Once the plan terminates, there is no opportunity to modify. That's the potential sentence as a result. If somebody hits the lottery in three years and a day, plus we have the language of ransom, where it said at least one of Congress' intent was to, quote, ensure that debtors would pay creditors the maximum they can afford. And, Your Honor, I would argue that that is what they can afford, not what, if there's a negative disposable income, there's obviously a test that Congress came up with to decide what the debtor can afford. Right, but that's on a monthly basis. But that doesn't really speak to the question of duration. The disposable income is what it is, and it's projected for the future. But the 148 is going to be the 148 whether it's three years or five years. That's where we started the discussion. So, presumably, for the purposes of this case, 148 a month indefinitely is what is affordable. Well, I would say that, Your Honors, the debtors are making a sacrifice on their budget. The means test has shown that they have a negative $600 disposable income. They are choosing to sacrifice their personal budget for a period of time in order to save their property. And in order to do so, they are going to do without over a period of time. To then force them to a lengthier period of time just because they're $300 above median income for their community seems to me a punishment and not according to this Court's ruling in Kagan-Yama. Now, I have another question about congressional intent. If I can find the... I can't find it. There is a House report that is a little bit confusingly worded, but it starts... I'm not finding it exactly, but it starts with a title that is something like for five years, essentially. Chapter 13 plans to have five-year duration in certain cases. It certainly sounds like, and that's the above median income, I think, is what they're talking about. I would add it's above median with projected disposable income, that that's what they were referring to. Above median debtors with projected disposable income would be required to do a five-year plan. However, above median debtors with a negative disposable income I do not believe would be required to do a five-year plan. Otherwise, when we're talking about congressional intent, why would Congress have then allowed the presumption of abuse to be overcome by showing a negative projected disposable income and allowing debtors to do a Chapter 7, in which case the bankruptcy would be over and in two or three years, if they did win the lottery, that would not be relevant and the creditors could not capture those funds. All we're saying here is that I think there's an overreaching assumption that Congress intended to punish all above median debtors. I think there's an understanding at the time that this negative projected disposable income might result, and in fact the trustees had warned Congress about this, and Congress did not act on it. They still chose to enact the BATSEPA in the manner that they did, allowing for a presumption of abuse to be overcome when somebody showed a negative projected disposable income. Let me ask you about the amount in the 148, and I understand that was kind of negotiated, but was the 148 or whatever the numbers were reflective of the anticipated plan length, or is it just the amount that can be afforded on a monthly basis? It was just an amount to be afforded on a monthly basis, Your Honor. And that was, again, through the sacrifice of the debtor. Many times, as Ms. Schneider will attest to, when you're at a 341A hearing, it's a process where it's not necessarily an adversarial process. However, the trustee is standing in the shoes of unsecured creditors to a certain extent, and the debtors have to pick and choose their battles, and some negotiation can be done at that stage in order to avoid a lengthy confirmation process. And so that is what occurred in this particular case. So the duration does affect the total amount that has to be paid into the plan, not just the length of the plan and subject to modification, but the total aggregate sum. Yes, yes. And the trustee does not, or the court doesn't accept a multiplier. So the court stated that this is a temporal analysis in CAG and VIAMA, and not a multiplier unless there's a negative projected disposable income. And again, if, as Ms. Schneider said, debtors will present six-month plans, trustees and creditors may object to those plans on whatever basis under 1325, one of those being good faith and whether the debtor has put forth a good faith. In this particular case, the debtors are making negative $600 under Congress' test, and they have proposed a three-year plan, and they have made their sacrifice in order to save their home. As many debtors are doing in this day and age, they're trying to make that sacrifice in order to be able to maintain home ownership. In order to do so, I don't think we should punish them to extend them the extra two years, and I don't think that Lanning or Ransom have overruled this court in CAG and VIAMA as it relates to applicable commitment period. So how do they go about saving their home? In this particular case, they stripped under Section 506 of the Bankruptcy Code, they were able to strip the second mortgage, which was unsecured, was wholly unsecured off of their property, allowing them to just make their first mortgage payment and their payments under their regular household expenditures, and they could afford to then maintain their property. Why did they strip the second mortgage off their property? At a foreclosure? No, it's part of In re Zimmer. This court stated in In re Zimmer that if there is... Well, the treatment of unsecured creditors has to be equal, and the value of the property was found to be... Why would anybody put an unsecured mortgage on property? Well, at the time that the mortgage was obtained, it was not unsecured. It was value given, purchase money value given. Purchase money. However, the market has since plummeted, and those second mortgages in many instances are unsecured at this time. And under Bankruptcy Code Section 506, those liens may be avoided. That's not an issue. That's been avoided, and that's not an issue. That is not an issue. But the process... I'm just curious about how... Okay, so I didn't know that. The process is a process that is done in Chapter 13, Bankruptcy, and it allows debtors to keep their homes because of the treatment of unsecured creditors. They're all set into a particular class, and they must all be treated equally. They can't get a preference payment. So if the house is, as they say, underwater, then the security is worthless, so they then fall in with the unsecured creditors. That is correct. I see. But the lien is not stripped until the debtors are able to reach a discharge. And just one last point, Your Honors. Debtors... One of the things that has been discussed much lately in the Central District is the fact that we have so few cases reaching discharge. And the reason why is because the reality of what we're living through is that most debtors don't reach the end of their cases because of intervening factors. Somebody gets sick, somebody loses a job. It's very difficult to go extend a plan out to five years. Therefore, there is a public policy interest in seeing that a three-year plan complete as opposed to extending it out further to a five-year plan and make it even more difficult for debtors to reach the end of the road and get that fresh start that we believe they're entitled to. All right. If there are no further questions... Thank you. Thank you. Well, where to start? First of all, we were talking about... there was some discussion about senseless result. And when Justice Beah was talking about the senseless result, I think he was referring to, in addition to the ability for creditors, if there's a change in a person's financial circumstances, that under the holding of Kagan-Vema, that you can propose... you have a class of creditors... a class of debtors, I'm sorry, that can propose a plan that can be of any plan length duration. There is no minimum mandatory requirement. You have a class of debtors who are above median with positive projected disposable income who, under Kagan-Vema, have to propose a 60-month plan. You have another class that are below median that, under the holding of Kagan-Vema, have to propose a 36-month plan. But under the holding of Kagan-Vema, you have a third class where your projected disposable income is zero or negative that can propose a plan of any length. Now, Ms. Clark has brought up to the Court that there are other provisions in the statute to address that. She's referring to what we call good faith under 1325A. However, the fact of the matter is that they can do it and there is nothing that can keep them from stopping... from not doing it under the holding of Kagan-Vema. So we have this senseless result where you have three classes of creditors and it applies to two but not the third. Debtors or creditors? I'm sorry. Debtors. I'm sorry. That's confusing enough to me, and I... Yeah, and I also, in my reply brief, I got it wrong in terms of the minimum-maximum, so I apologize to the Court for that. What makes interpretation of this particular... of BAF-CEPA so extremely difficult is the fact that you're imposing a law on top of an already existing law and that new law is incorporating concepts having to do with the IRS manual and people who can afford to pay. And we'll also have some issues having to do with the Census Bureau and using data from the Census Bureau and what does that mean in terms of the means test. Now, I'm going to use the analogy of a crossword puzzle because you can imagine if you tried to put together three crossword puzzles and make them fit, your attention to detail is going to have to be impeccable to make it work. And unfortunately, the statute that we got did not do that. All right? It just plain... It just... They didn't consult the drafter... the engineering drafter... the drafter-engineers to make it... to make it fit really well. And that's the problem we have today. That's the reason why we have the issues having to do with Kagan-Vema. But after Lanning, Lanning did not adopt the exclusively-linked rationale. It looked to other rationale for its holding. When it did not adopt the exclusively-linked rationale, in effect, it said you can look to other things, not just specifically to that one section of the statute. So for purposes of projected disposable income, you go to disposable income, but if there's relevant factors, you can go there. So now it coexists. It coexists with the concept of projected disposable income. And what the trustee is arguing is that this mandatory term also coexists with applicable commitment period in B1 for the purposes of calculating projected disposable income. And in that regard, it acts as a multiplier, as it did under pre-BAF-SEPA, but it also effects congressional intent, and that is that there was a mandatory three- or five-year period, depending on whether you were above or below median income. I have a very elementary question, not being very familiar with bankruptcy law. So if it is read... if Kagan-Vena is read as not imposing a mandatory minimum, there's no mandatory three or five in this situation, this third category you mentioned, then how... that's just negotiated? The plan length at that point is... how is that resolved? How is that resolved? Yeah, the creditor, the debtor wants to say, I want a two-month plan. When Kagan-Vena first came out, we had debtor's attorneys, not co-counsel. They always kept it at 36 months. But we did have attorneys who did propose plans at six months, two months, a year. Usually those cases fell by the wayside for other reasons. That issue never really got presented to the bankruptcy courts. I don't recall having to do a brief on that at the bankruptcy court because the case did not survive for other reasons. So we never really got into a litigation where we had to submit briefs to the bankruptcy court. This case, when it came, we had two issues, and it gets to the issue of the lien strip and the amount of the plan payment. But these are debtors who came in with no arrears on the real property. They didn't owe any debt to the IRS. I think, if I remember right, they owed very little unsecured debt. I think it was around $7,000, but I'd have to look at the record for the accurate number. And what they came in to do in bankruptcy  They can get a valuation of the property, and if that second trust deed is wholly unsecured, they can pay it as an unsecured creditor. So they're getting a real good benefit coming into 13. It was a clean case because it was clearly a 36 or a 60 month. They were above median and did apply. There's another case called In Re Tran that's out in the Northern District of California that talks about these situations where you're coming into a 13 specifically to do nothing more than a lien strip and whether that is good faith or bad faith. And the purpose of a 13 is to pay your creditor. You're not questioning the good faith finding here. No, absolutely not. The trustee let that go for purposes of the purity of the facts in this case after Tennyson just to bring this issue once again to the Ninth Circuit on the applicable commitment period. Because we wanted to keep the case clean. But absent the applicable commitment period, if it doesn't apply for whatever reason, then it's something that the bankruptcy court has to decide on a case-by-case basis. If there is a dispute and it gets litigated, if there's not a consensual, in other words, if the three or five year mandatory period were not to apply. Using the holding in Kagan-Vema. Yeah. Then where do we go from there? It's up to the bankruptcy court ultimately. It would have to be litigated to the bankruptcy court, which is exactly what we did in this case. Right. So the question is where these mandatory durational requirements can supersede, in effect, what otherwise would be an adjudicated outcome in the bankruptcy court. If I understand your question correctly, if there's not a mandate in the statute, then what we're creating is for a certain class of creditors, it's always going to be adjudicated? Is that what you're asking? Subject to adjudication. Subject to adjudication, yes. Right. Okay. Thank you very much. Thank you. Thank you. And Congress intended all this. All right. That concludes our work for today.
judges: Chen, Pregerson, Graber